Madden, Judge,
delivered the opinion of the court:
The plaintiff sues to recover income taxes collected from it for its fiscal years 1949 and 1950, and income and excess profits taxes for its fiscal year 1951. It claims that it was entitled to exemption from these taxes because its income was devoted to the benefit of New York University, an admittedly qualified educational institution.
Two Knapp brothers were the owners of all the stock of Knapp Brothers, Inc. which for many years had, in conjunction with subsidiaries owned by it, been engaged in the business of manufacturing and selling men’s shoes. In May or June of 1947 a representative of the Knapps went to Mr. *799 John Gerdes, a prominent alumnus and general counsel of New York University, to ask if he and his associates would be interested in buying the Knapp business for the benefit of New York University. Many conferences were held with Mr. Gerdes and many financial statements were submitted to him. The company was having a very prosperous year in 1947, because O. P. A. restrictions and other Government controls had been lifted and new manufacturing plants had been acquired and were getting into full production.
Mr. Gerdes would not consider the purchase until the earnings for the full year 1947 were known. Early in 1948 that information was available and Mr. Gerdes concluded that the business had a promising future. The Knapps asked $5,100,000 for the business. Mr. Gerdes studied the financial history of the company for prior years and for 1947. For 1947 the company had a net profit before Federal income taxes of $1,461,139 and after taxes of $908,792. That year was by far the most profitable year in the company’s history. Mr. Gerdes apparently thought, from his study of that history, that the 1947 experience would probably be repeated in subsequent years.
Mr. Gerdes applied several different methods of determining value. He was a specialist in the field of corporate finance and reorganization, and applied his expert knowledge to the problem of the Knapp purchase. He thought that the national economy would continue to improve after 1947 and that the Knapp enterprise was well situated to grow with the economy. As a result of his study, he concluded that $5,100,000 was a fair price for the business.
In March 1948, Mr. Gerdes and two of his law partners organized the plaintiff corporation, Knapp Brothers Shoe Manufacturing Corporation, a Delaware corporation. It had a capital of $1,000, the ten $100 shares being divided between him and his two associates. The certificate of incorporation of the plaintiff corporation stated that it was organized exclusively for charitable, scientific, literary and/ or educational purposes, and that no part of its income or property should enure to the benefit of anyone other than New York University; that no stockholder should be entitled to dividends on his shares.
*800 Before the organization of the plaintiff corporation, Mr. Gerdes had ascertained that the new company could borrow $918,000 from the First National Bank of Boston, for its down payment to the Knapps. The agreement to purchase the property was closed, the down payment was made, and collateral mortgage notes due 20 years from date, with interest at three percent per annum, secured by a mortgage on all the physical assets of the business were given the Knapps for the balance of the purchase price.
As a part of the purchase transaction, a ten-year employment contract was made with the Knapp brothers. The employment contract was terminable at the option of the plaintiff after it had paid off the collateral mortgage notes. The salaries provided in the employment contract were reasonable.
The purchase turned out to be immediately and spectacularly advantageous to the purchaser. Within a little more than a year the plaintiff had paid its bank loan of $918,000 and by December 26, 1951, it had paid all of its debt to the Knapps, with interest. It had also paid its Federal taxes, though it denied liability for them and made claim for their refund. During the tax years in question it made no cash contribution to New York University, though, under its arrangement with the Knapps, it was free to use a considerable part of its income as it pleased. Instead, it paid its debts.
Section 101 of the Internal Revenue Code of 1939, 26 U. S. C. (1952 Ed.) 101 says:
Sec. 101. Exemptions From Tax on Corporations.
* * * the following organizations shall be exempt from taxation under this chapter—
‡ ‡ ‡
(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying-on propaganda, or otherwise attempting, to influence legislation.
*801 By section 454 of the Internal Revenue Code of 1939, as added by section 101 of the Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137, corporations exempt from income tax under section 101, above quoted, were exempted from excess profits taxes.
There was litigation as to whether section 101 (6), above quoted, granted exemption to a corporation which engaged in a regular commercial business, even though its income was devoted exclusively to one of the purposes named in the statute. In C. F. Mueller Co. v. Commissioner, 190 F. 2d 120, C. A. 3, Sico Co. v. United States, 121 C. Cls. 373, and Souths eastern Fair Assn. v. United States, 100 C. Cls. 216, that question was answered in the affirmative. Contra, United States v. Community Services Inc., 189 F. 2d, 421, C. A. 4.
The exemption for such enterprises was eliminated by section 301 (b) Title III, of the Revenue Act of 1950, 64 Stat. at page 953, 26 U. S. C. (1952 Ed.), sec. 101 (12) (B) (ii). But Congress, in section 601 of the Revenue Act of 1951, 65 Stat. 452, 562, 26 U. S. C. (1952 Ed.), 101 note, provided:
Sec. 601. ExeaiptioN op CertaiN Organizations From INCOME Tax por Prior Taxable Years.
Section 302 of the Revenue Act of 1950 (relating to exemption of certain organizations for past years) is amended by adding at the end thereof the following new subsection:
“(d) Profits inuring to the benefit of certain educational organizations or hospitals. — For any taxable year beginning prior to January 1,1951, an organization operated for the primary purpose of carrying on a trade or business for profit, no part of the net earnings of which inures to the benefit of any private shareholder or individual and all of the net earnings of which inure to the benefit of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activitites are regularly carried on, or to the benefit of a hospital, or an institution for the rehabilitation of physically handicapped persons, which maintains or is building for proper maintenance a hospital or institution staffed or to be staffed by qualified professional persons for the treatment of the sick and/or the rehabilitation of the physically handicapped, shall not be denied exemption from taxation under section 101 of the Internal *802 Revenue Code on the ground that it is carrying on a trade or business for profit. The determination as to whether an organization other than one described in this subsection is exempt under section 101 of the Internal Revenue Code from taxation for any taxable year beginning before January 1, 1951, shall be made as if this subsection and section 301 (b) of this Act had not been enacted and without inferences drawn from the fact that this subsection and the amendment made by section 301 (b) are not expressly made applicable with respect to taxable years beginning before January 1, 1951.”
The plaintiff urges, of course, that this statute fits its situation exactly.
The Government urges that the plaintiff was not organized and operated exclusively for educational purposes during the years in suit. It says that the plaintiff’s income went to the Knapps during those years, and none of it went to the University. But the payment of the plaintiff’s debt to the Knapps added, dollar for dollar, to the assets of the University. The fact that the money was saved, and not currently spent, is immaterial.
The Government says that the plaintiff paid too much for the property; that therefore it was not an arm’s-length purchase, but an arrangement whereby the Knapps, looking forward to inheritance taxes and assets difficult to liquidate, were ridding themselves of a burdensome property; that the plaintiff, having no assets, had nothing to lose by entering into the arrangement. The contention that the plaintiff paid too much for the property is obviously not a teaching of hindsight. As we have seen, the purchase was a great bargain. There was no recognized economic principle that business would necessarily be worse after 1947 than in that year. There were special elements in the situation of this business that indicated, rightly as it turned out, that it would maintain or exceed the 1947 level of profit.
When the Knapps sold to the plaintiff, they ceased to be the owners of the business, and were interested in it only as secured creditors. If it had turned out that the plaintiff could not pay for it, the Knapps would have, by foreclosure, again become the owners. But until that should happen, the plaintiff owned and controlled the enterprise, and used the *803 income to acquire assets for the University. Section 601, quoted above, is applicable, and the plaintiff is entitled to the exemptions claimed.
The plaintiff may have a judgment for $2,673,770.08*, with interest as provided by law.
Laramore, Judge; Whitaker, Judge; Littueton, Judge; and J ones, Ghief Judge, concur.
findings of fact
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a Delaware corporation, having its principal office in Brockton, Massachusetts, brought this action to recover income taxes paid by it for the fiscal years ended March 31, 1949, and March 31, 1950, and income and excess profits taxes paid by it for the fiscal year ended March 31, 1951, to the Collector of Internal Revenue for the District of Massachusetts. The suit is based on the claim that plaintiff was exempt from income and excess profits taxes for the years stated under Section 101 (6) of the Internal Revenue Code of 1939, Section 454 of the Excess Profits Tax Act of 1950, and Section 302 of the Revenue Act of 1950, as amended by Section 601 of the Revenue Act of 1951.
2. On March 23, 1948, and for a number of years prior thereto, Knapp Brothers, Inc., in conjunction with its subsidiaries, was engaged in the business of manufacturing and selling men’s shoes.
3. Prior to March 23, 1948, Clarence E. Knapp and his brother, Elwin D. Knapp, each owned 400 shares of the capital stock of Knapp Brothers, Inc., a Massachusetts corporation having its principal office in Brockton, Massachusetts, said shares constituting all of the issued and outstanding stock of the corporation. At that time, Knapp Brothers, Inc., owned all of the stock of Knapp Brothers Shoe Manufacturing Company (a Massachusetts corporation), M. A. Packard Company (a Massachusetts corporation), Montello Shoes Inc. (a Massachusetts corporation), Hammond Realty *804 Company (a Maine corporation), and Barker Shoe Company (a Maine corporation), which together with Knapp Brothers, Inc., are hereinafter sometimes referred to as the “Old Companies.”
4. New York University is and was for the taxable years involved in this proceeding an educational institution exempt from Federal income tax by virtue of the provisions of Section 101 (6) of the Internal Revenue Code and exempt from excess profits tax by virtue of the provisions of Section 454 of the Internal Revenue Code. New York University normally maintains a regular faculty and cur.riculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activities are regularly carried on.
,5. New York University is a nonsectarian institution which does not receive financial support from either the city of New York or the State of New York. Its student population is one of the largest in the world, representing not only the New York community but almost every State in the Union and a large number of foreign countries.
6. In May or June of 1947, a representative of the two Knapp brothers came to John Gerdes, who was a prominent alumnus and general counsel of New York University, to ascertain whether he and his associates would be interested in acquiring the stock of Knapp Brothers, Inc., for the benefit of New York University. Thereafter, Mr. Gerdes held a number of conferences with the two Knapp brothers and their legal counsel, and at Gerdes’ request, numerous financial statements, including those for the first six months of 1947, were submitted to him. During the conferences, the Knapp brothers were optimistic about the future of the company, stating that it had always been able to sell all of the shoes it could manufacture, that new manufacturing plants had been acquired, and that with the lifting of O. P. A. restrictions and other Government controls, it could be expected that the earnings of the business would increase substantially. Mr. Gerdes agreed as to the future possibilities of the business, but he did not feel he could consider the purchase until the earnings for the full year 1947 were ascertained. In the early part of 1948, Mr. Gerdes was *805 shown the consolidated profits statement of Knapp Brothers, Inc., and its subsidiaries for the year 1947, as well as the consolidated balance sheets for that year, and he reached the conclusion that the statements fully justified the opti-' mism of the Knapp brothers as to the future of the business.
7. In 1947, when negotiations were entered into between Mr. Gerdes and the two Knapp brothers for the acquisition of all of the outstanding shares of Knapp Brothers, Inc., stock, the major portion of the business of that company and its subsidiaries was the manufacture and sale of men’s shoes directly to consumers through sales agents who canvassed customers on a house-to-house basis. These sales agents worked solely on a commission basis. When taking an order the sales agent retained the initial downpayment as his compensation, and the order was then forwarded to the factory which shipped the. goods to the consumer on a cash-on-delivery basis for the balance due. In addition to such sales, a substantial portion of the business of Knapp Brothers, Inc., and its subsidiaries was the manufacture and sale of shoes to Sears, Roebuck and Company.
8. Prior to 1939, Knapp Brothers, Inc., had no manufacturing facilities of its own and all of the merchandise which it sold was purchased from other shoe manufacturing companies. In 1939, a wholly owned subsidiary, Knapp Brothers Shoe Manufacturing Company, was incorporated and that company acquired manufacturing facilities by means of which it manufactured and supplied shoes directly to its parent, Knapp Brothers, Inc., for resale. This decision to manufacture its own shoes resulted in an immediate increase in sales so that up to the beginning of World War II, the company’s business almost doubled. The Knapps believed this increase was due to the fact that the company had a better control over the quality of its products and also that-it had developed a new type of workshoe which became very popular. However, with the inception of World War II, Knapp Brothers, Inc., took on large Government orders for military shoes at very little profit, with the result that its production facilities were inadequate to manufacture shoes for civilian purposes also. There was therefore a very substantial decrease in income to the company during the war *806 years. However, with the termination of World War II in 1945, it became apparent that the demand for the Knapp shoe would far exceed the manufacturing capacity of the company. Sears, Roebuck and Company was seeking substantial orders from Knapp Brothers, Inc., and, in addition, there was a large pent-up civilian demand for shoes because of rationing during the war years. Although O. P. A. restrictions and other Government controls continued during 1946, there was a sharp upturn in the business of Knapp Brothers, Inc., despite the fact that the full possibilities of the business were not realized because of the company’s inadequate productive capacity. The manufacturing facilities of the Barker Shoe Company of Lewiston, Maine, were acquired in 1945, but the impact of that production was not felt until 1947. Even with the acquisition of these facilities, the company was not able to manufacture all of the shoes which it was able to sell, and in November of 1947, the manufacturing facilities of the M. A. Packard Company of Brock-ton, Massachusetts, were acquired.
As of March 31, 1948, Knapp Brothers, Inc., and its subsidiaries had a total of 256,729 square feet of space available for manufacturing in the three plants and the productive capacity of shoes at these plants was 575 dozen pair per day, or 1,725,000 pairs per annum.
9. Knapp Brothers, Inc., paid dividends of $50,000 in 1937 and the same amount in 1938. No other dividends or distribution to shareholders were made by Knapp Brothers, Inc., prior to the acquisition of the business by plaintiff. All other net earnings during that period were put back into the business.
10. The price requested by the two Knapp brothers for all the issued and outstanding shares of Knapp Brothers, Inc., was $5,100,000. One of the financial statements relied upon by Mr. Gerdes in passing upon the reasonableness of the purchase price was the consolidated statement of profit and loss of Knapp Brothers, Inc., for 1947. This statement showed that Knapp Brothers, Inc., had a net profit in 1947 before Federal income taxes of $1,461,139, and that the net profit after payment of estimated Federal income taxes was $908,792.
*807 Mr. Gerdes received and also relied upon the following consolidated balance sheet of Knapp Brothers, Inc., and its subsidiaries as of December 31,1947:

Assets

Current Assets:
Cash_ $912, 578
Government Bonds_ 55,000
Accounts Receivable_ 421,211
Subscriptions Receivable-
Inventory — Net_1, 817,546
Notes Receivable_
Total Current Assets_ 3,206,335
Plant Accounts — Net_ $259, 817
Prepaid Items and Deferred Charges_ 33,490
Due from Employees_ 987
Lasts, Dies & Patterns_ 10,257
Investment — Affiliates_ 58,093
3,568,979

lAaMlities

Current Liabilities:
Notes Payable_ 31,900
Accounts Payable_ 413,745
Subscriptions Payable-
Accrued Items_ 66,615
Operating Reserves_ 147,374
Reserve for Federal Income Taxes_ 613,156
Total Current Liabilities_ 1,272,790
Capital and Surplus_ 2,296,189
Total Liabilities_ 3,568,979
11. In determining that the price of $5,100,000 for all of the issued and outstanding shares of Knapp Brothers, Inc., was fair and reasonable, Mr. Gerdes made various computations which are summarized as follows:
(a) He assumed that future income would at least equal the 1947 income of $1,461,139 before taxes, and he discounted the income to the round figure of $1,400,000. From this, he deducted 3y2 percent interest, which would be payable during the first year of plaintiff’s existence on a bank loan of $918,-000 to be obtained for use as a cash downpayment to the *808 Knapps. He also deducted 3 percent interest, which, would be payable on notes to be issued to the Knapps for $4,182,000, the balance of the purchase price. He reduced the resulting figure by 38 percent thereof for taxes and by the further sum of $500,000 to cover the retirement of indebtedness. Prom these calculations, it appeared that the balance of net profit during the first year would exceed $270,000. By considering that the net earnings in subsequent years would be increased through reduction in the indebtedness in the amount of $500,000 annually and that the interest charges on the debt would be reduced proportionately, Mr. Gerdes determined that the average annual net earnings of the new corporation for the first 10 years after allowing for interest, income taxes, and amortization of the notes would be approximately $657,590. His calculations further showed that at the end of the 10-year period, the bank loan and the notes to be issued to the Knapps would be completely retired and that the corporation would have increased its assets by over $3,000,000.
(b) As a second method, Mr. Gerdes used substantially the same formula which was employed by the Commissioner of Internal Revenue in the valuation of Ford Motor Company stock and which is referred to in the Couzens case (11 B. T. A. 1093). Using this formula he deducted the net worth of Knapp Brothers, Inc., from the proposed purchase price and arrived at a figure of $2,803,811.35, representing good will. By capitalizing the net worth at eight percent, he arrived at an annual net return of $183,695.09. He then took the 1947 income after taxes, subtracted from it the eight percent return on net worth and arrived at the figure of $725,097.27, which represented the return on good will. He capitalized the good will at 15 percent (62/3 times the earnings) and arrived at a figure of $4,833,981.80 for the total value of the good will. To this figure he added the book value of net worth and arrived at a total value of $7,130,170.45.
(c) As a conservative measure, Mr. Gerdes used the same formula described in (b) above, except that he substituted a 10 percent figure for the 8 percent figure there mentioned and capitalized good will at 20 percent (5 times earn *809 ings). By this formula, he arrived at a total value of $5,692,056.10.
(d) As another alternative method of valuation, Mr. Gerdes ignored the value of all of the assets of Knapp Brothers, Inc., and simply capitalized its 1947 net earnings after taxes at the rate of 10 percent and arrived at a value of $9,000,000. He also capitalized the net earnings at the very conservative rate of 15 percent and arrived at a value in excess of $6,000,000.
12. Although he believed that the new corporation to be organized by himself and his associates would be tax exempt, Mr. Gerdes gave no effect to tax exemption in determining whether $5,100,000 was a fair and reasonable price for the stock of Knapp Brothers, Inc. In the first place, Mr. Gerdes did not feel that the seller should get the benefit of the tax exemption, and in the second place, he realized that the tax laws might be changed at any time.
13. Prior to March 23, 1948, appraisals of the assets of Knapp Brothers, Inc., and its subsidiaries, showed that the fair market value of such assets was approximately $850,000 in excess of their book value. However, such additional value was not taken into account in determining the reasonableness of the purchase price.
14. In making the determination that the proposed purchase price was fair and reasonable, Mr. Gerdes assumed that the national economy would continue to improve after 1947. He also felt that the selling methods used by the Knapps have advantages over the usual methods of selling shoes through jobbers and retailers, because with the Knapp plan (1) it is not necessary to incur capital expenditure for store locations; (2) the salaries of store personnel are eliminated; (3) all sales are for cash on delivery and there is no credit risk; and (4) a complete inventory is maintained at one central location rather than a separate inventory at each store.
15. Mr. Gerdes has been engaged in the practice of law 35 years, is the senior member of his law firm, and was professor of the Law of Corporate Finance and Corporate Keorgan-' ization at the Law School of the New York University for' over 15 years. He is a specialist in the field of corporate *810 finance and reorganization and is the author of a three-volume work on corporate reorganization, which has been cited by many of the courts. Both in the American Bar Association and in the New York State Bar Association, he has served as chairman of committees concerned with corporate reorganization and corporate law. He was one of the advisers to the American Law Institute on the Restatement of the Law of Business Associations. He has had extensive experience in advising corporations on their organization and reorganization, as well as on the valuation of their securities. He was well qualified to pass on the reasonableness of the valuation placed by himself for the plaintiff on the stock of Knapp Brothers, Inc., as of the date the contract of sale was executed.
16. After he was satisfied that the proposed purchase price was fair and reasonable, Mr. Gerdes, Dudley L. Miller, and Winthrop A. Short duly organized plaintiff as a Delaware corporation on March 12, 1948. Mr. Miller and Mr. Short are alumni of New York University and are members of the law firm of Gerdes & Montgomery.
17. On March 23,1948, plaintiff entered into an agreement to acquire from Clarence E. Knapp and his brother Elwin D. Knapp all of the 800 issued and outstanding shares of Knapp Brothers, Inc., for a total consideration of $5,100,000.
18. On the basis of the calculations made by Mr. Gerdes, who took the profit of Knapp Brothers, Inc., for the year 1947 and assumed that profits in future years would be at least equal to the 1947 profits, the consideration paid by plaintiff war fair and reasonable. However, if the valuation of the business had been based on the net earnings of Knapp Brothers, Inc., for the years prior to 1947, the consideration paid by plaintiff was excessive.
19. The transfer by Clarence E. Knapp and his brother, Elwin D. Knapp, to the plaintiff was carried out on March 31,1948. At and immediately after the closing on that date, the following transactions occurred:
(a) The plaintiff, pursuant to an agreement previously made by it with the First National Bank of Boston, received $918,000 on a loan from said bank.
*811 (b) Clarence E. Knapp and Elwin D. Knapp delivered to the plaintiff properly endorsed certificates for the shares transferred, together with written resignations of the officers and directors of the Old Companies.
(c) New share certificates of the stock of the Old Companies were issued to the plaintiff.
(d) New officers and directors were elected for the Old Companies by the representatives of the plaintiff.
(e) An instrument designated “Indenture of Trust and Mortgage” dated March 31,1948, was executed and delivered by the plaintiff to Clarence E. Knapp and Elwin D. Knapp, pursuant to their designation therein as “Trustees.”
(f) The amount of the loan obtained from the First National Bank of Boston, $918,000, was paid by the plaintiff to Clarence E. Knapp and Elwin D. Knapp as a cash down-payment under the agreement of March 23, 1948, and delivery was made to them of instruments designated in the contract and hereinafter referred to as Collateral Mortgage Notes for the balance of the purchase price. Clarence E. Knapp and Elwin D. Knapp each received $459,000 in cash and $2,091,000 in said instruments. The Collateral Mortgage Notes were due 20 years from the closing date, bore interest at three percent payable annually, and were secured by a mortgage covering all lands and buildings, together with all machinery, equipment and furniture, then owned by the plaintiff or thereafter acquired by it.
(g) Appropriate action was thereafter taken by the officers and directors of the plaintiff and by the new officers and directors of the Old Companies to merge the Old Companies (except Montello Shoes, Inc.) into the plaintiff. Under the terms of the merger, all of the shares of the Old Companies so merged into the plaintiff (except Montello Shoes, Inc.) were cancelled, and no cash, shares or securities were issued for such shares. The merger was consummated on March 31, 1948. The plaintiff retained the ownership of all the outstanding shares of Montello Shoes, Inc., which was not merged in plaintiff, because Montello was the organization through which shoes were sold to Sears, Koe-buck and Company.
*812 (h) As an integral part of the transaction, a 10-year employment contract was entered into between the plaintiff and Clarence E. Knapp and Elwin D. Knapp.
20. The following is a copy of one of the Collateral Mortgage Notes issued by plaintiff to the two Knapp brothers:
Knapp Brothers Shoe Manufacturing Corporation
COLLATERAL MORTGAGE NOTE
SERIES A
$1,568,250
Boston, Massachusetts,

March 31, 1948.

No. A1
For value received, the undersigned, Knapp Brothers Shoe Manufacturing Corporation (hereinafter called the “Company”), a corporation organized and existing under the laws of the State of Delaware, hereby promises to pay to the order of Elwin D. Knapp the principal sum of One Million Five Hundred Sixty-Eight Thousand Two Hundred Fifty Dollars ($1,568,250) on March 31, 1968, with interest on the unpaid balance thereof from the date hereof until the principal amount hereof shall have become due and payable, at the rate of 3% per annum, payable annually on the 31st day of March in each year commencing March 31, 1949. Payments of both principal and interest are to be made at the principal office in Boston, Massachusetts, of The First National Bank of Boston.
This note is a Series A Note, and is one of an authorized issue of notes of the Company known as its Collateral Mortgage Notes (hereinafter called the “Notes”), limited to the aggregate principal amount of $4,189,000, consisting initially of an aggregate principal amount of $3,136,500 of Series A Notes, $522,750 of Series B Notes, and $522,750 of Series C Notes, all issued under and in accordance with, and secured by, a certain Indenture of Trust and Mortgage dated March 31, 1948, hereinafter referred to as the “Indenture”, under which the Company has pledged, conveyed, mortgaged, transferred and assigned to Elwin D. Knapp and Clarence E. Knapp, as Trustees, certain lands, buildings, machinery, equipment, furniture, fixtures, vehicles and delivery equipment of the Company. Reference is hereby made to the Indenture for a description of the property pledged, conveyed, mortgaged, transferred and assigned as aforesaid, and for a statement of the nature and ex *813 tent of the security, the terms and- conditions under which the Notes are secured and a description of the rights and remedies thereunder of the respective holders of Notes, and of the rights and obligations of the Company and of the Trustees thereunder.
The Company agrees to prepay installments of principal in the manner specified in the Indenture until the Notes shall be paid in full.
Series A Notes are not subject to reduction in principal amount except to the. extent of payment thereof to the holders of such Notes; Series B Notes and Series C Notes may be reduced in principal amount through the happening of certain contingencies, and as so reduced may be exchanged for Series A Notes, in the manner provided in the Indenture.
The Notes, including this Note, are subordinate to any and all loans to the Company to the extent and subject to the restrictions provided in the Indenture.
In case any event of default, as defined in the Indenture, shall occur and be continuing, the principal of this Note may be declared due and payable in the manner provided in said Indenture.
No reference hereunder to the Indenture, nor any provision of this Note or of the Indenture, shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and the interest on this Note at the times and places and at the rate described herein.
The Company, and every holder of this Note by accepting and holding the same, consent and agree to all of the provisions of this Note and of the Indenture.
KNAPP BROTHERS SHOE MANUFACTURING CORPORATION,
By [s] WiNthrop A. Short,

President.

By [s] John Gerdes,

Treasurer.

21. The capitalization of plaintiff at $1,000 was nominal and was intended only to supply the minimum amount of capitalization required to do business under the laws of the State of Delaware. Early in the negotiations, Mr. Gerdes made it clear that the purchase price to be paid by plaintiff would have to be paid out of the earnings of plaintiff. The organizers of plaintiff were of the opinion that the purchase of the business from Knapp Brothers, Inc., would have *814 to be on such terms as would enable the plaintiff to continue the business on the basis of the capital structure transferred to plaintiff, and Mr. Gerdes felt that the capital was adequate.
During the negotiations, Mr. Gerdes proposed that the cash downpayment be made with a loan to be obtained by plaintiff from the First National Bank of Boston. By provisions .contained in the Collateral Mortgage Notes and in the trust indenture, the notes were subordinated to the loan obtained for the cash downpayment and to future loans which might be made to plaintiff for the purpose of financing current operations. These provisions were included, because Mr. Gerdes realized that if it became necessary for plaintiff to borrow money in the future to finance current operations, the bank making the loan would require a subordination agreement.
22. The Collateral Mortgage Notes consisted of Series A notes in the amount of $3,136,500, Series B notes in the amount of $522,750, and Series C notes in the amount of $522,750. The Series A notes were negotiable. However, the Series B and Series C notes were not negotiable during the years involved in this action because both the notes and the Indenture of Trust and Mortgage provided that such notes were subject to offsets for any claims asserted against the Old Companies within six years from the date of issuance of the Series B notes and within 10 years of the date of issuance of Series C notes.
The provisions restricting the negotiability of the Series B and Series C notes were made, partly to protect the plaintiff against unknown claims or deviations from the figures contained in the financial statements submitted to Mr. Gerdes prior to the sale to plaintiff. After the sale to plaintiff, the records of the Old Companies were audited by the Internal Revenue Service and additional taxes were assessed. Plaintiff paid the taxes and then set off the amount paid against the notes.
An additional reason for limiting the negotiability of the notes was the inclusion in the contract of sale of the following provisions:
*815 The Buyer agrees that, so long as any part of the Collateral Mortgage Notes remains unpaid, no mortgage, pledge or other lien shall be placed on its inventories, finished or unfinished, or on its accounts receivable, without the written consent of the Sellers or of the survivor of them, or if neither shall survive, of their personal representatives, that such mortgage, pledge or lien is in the best interest of the Buyer; provided, however, that in the event of any disagreement between the Buyer and the Sellers or their personal representatives as to whether such consent would be in the best interest of the Buyer, or' in the event that the Sellers shall both become incapacitated or unable to consent, then the matter shall be submitted to the President of the American Institute of Accountants, or a person designated by him, as Arbitrator; if he does not consent to act within three (3) days after request or does not designate another person to act as Arbitrator within said period, the President of the American Arbitration Association shall designate such Arbitrator. The decision of such Arbitrator shall be final and binding upon all parties. It is further agreed that in the event of default in the payment of principal or interest on the Collateral Mortgage Notes, all inventories and accounts receivable shall be assigned to the Sellers as additional security for said Collateral Mortgage Notes.
sjí sfc ifc #
13. So long as any part of the Collateral Mortgage Notes remains unpaid, there shall be no fundamental change in the business of the Buyer, and no sale or other disposition (by merger, consolidation or otherwise) of any assets of the Buyer, substantially as an entirety, shall be made, without the written consent of the Sellers or the survivor of them; provided, however, that no consent shall be necessary if both Sellers die or become totally incapacitated. So long as any part of the Collateral Mortgage Notes remains unpaid the Buyer will not change its name without like consent.
*****
Paragraph 8 of the Indenture of Trust and Mortgage contained substantially the same language as paragraph 13 above.
The above-quoted provisions were inserted in the agreement as a protection to the Knapps, the principal creditors of plaintiff. In view of the rights thereby granted to the Knapps, Mr. Gerdes preferred that the Knapps remain as *816 the owners-of the Series B and Series C notes until the notes were paid, because the Knapps were familiar with the business and its needs. Consequently, he believed that the restrictions on the negotiability of the Series B and C notes were essential to the smooth functioning of plaintiff’s business.
23. The organizers of plaintiff knew very little about the manufacture and sale of shoes. For this reason, Mr. Gerdes stated at the beginning of the negotiations that plaintiff would not be interested in buying the business unless the two Knapp brothers would enter into a long-term employment contract with plaintiff in order that it would be assured of a continuance of the management which had made the business successful. Therefore, the contract of sale of March 28, 1948, provided that Elwin D. Knapp and Clarence E. Knapp would execute a management employment contract with plaintiff. The employment contract, which was executed by plaintiff and the Knapps on March 31, 1948, provided in pertinent part as follows:
1. The Corporation hereby employs the Knapps as the principal executives and managers of its operation of the aforesaid businesses, with full authority to determine general policies, management, hiring, firing, salaries, labor rates, purchase of materials, methods of sales and of manufacture and operation, subject to the general supervision of the Board of Directors of the Corporation. Either or both of the Knapps may exercise any of the powers herein conferred upon them. If they disagree as to any matter, it shall be referred to the treasurer of the Corporation for final decision.
2. The authority of the Knapps to manage said businesses shall in all respects be as complete and as full as may be exercised by the principal executive officers or general managers of any business; and they shall have all the powers heretofore exercised by them in the operation of the businesses.
7. The term of this agreement shall be for a period of ten (10) years, commencing with the day on which the Corporation acquires the hereinbefore mentioned businesses, provided, however, that the Corporation may, at its option, upon ninety days’ notice in writing, terminate this agreement at any time after it has made payment in full of the Collateral Mortgage Notes given by it to said Knapps in part payment of the purchase *817 price of the shares of stock of Knapp Brothers Inc. in accordance with the terms of agreement made between the Knapps and the Corporation dated March 23, 1948. Other than as provided for in this paragraph, this agreement shall not be terminable by the Corporation except for fraud or wilful misconduct on the part of the Knapps.
Paragraph 7, quoted above, was included in the employment contract for the benefit of the Knapps as large creditors of the plaintiff. Mr. Gerdes and his associates thought it desirable to provide that one of the terminal dates of the employment contract would be the date when the indebtedness to the Knapps was paid. However, the option to terminate the contract upon the payment of such indebtedness was given to plaintiff and not to the Knapps.' As will hereinafter appear, the notes were paid by plaintiff long prior to the end of the 10-year period specified in the employment contract, but plaintiff has not exercised its option to terminate that contract.
24. The salaries paid by plaintiff to Clarence Knapp and Elwin Knapp during each of the taxable years were reasonable in amount.
25. Since its incorporation, and during all the taxable years involved in this proceeding, the plaintiff’s Certificate of Incorporation provided inter alia as follows:
Third: The Foundation is organized exclusively for charitable, scientific, literary and/or educational purposes and no part of its income or property shall inure to the private benefit of any stockholder, director, or officer, or any individual or corporation other than New York University. The directors shall from time to time distribute to New York University such part of the property and/or net income of the Foundation as they may determine and as may legally be distributable. The Foundation shall not in any way directly or indirectly engage in carrying on propaganda or otherwise attempt to influence legislation.
Fourth: The objects for which the Foundation is formed are:
(a) To distribute to New York University such part of its property and/or its net income, as the directors of the Foundation may determine.
*818 (b) Subject always to the provisions of subparagraph (a) of this Paragraph FOURTH: to manufacture, prepare for market, buy, sell, import, export, deal and trade in boots, shoes, and all kinds of footwear, and any and all products used in or in connection with footwear.
# # ❖ ❖
NiNth:...
(h) No stockholder shall at any time be entitled to dividends on his shares; nor shall he at any time be entitled to any of the profits or assets of the Foundation. The profits or assets of the Foundation available for distribution shall be paid from time to time, at the discretion of the directors, to New York University; and in the event of the liquidation, dissolution, or winding up of the Foundation, whether voluntary, involuntary or by operation of law, except as may otherwise be provided by law, the directors of the Foundation shall, after payment of all creditors, distribute the assets of the Foundation to New York University.
íj' ífs »{» »{•
Eleventh : The Foundation reserves the right, by vote of the holders of two-thirds of its outstanding shares, to amend, change, or repeal any provision contained in this Certificate in the manner now or hereafter prescribed by statute, Provided, however, that any such action shall not divert any of the income or property of the Foundation, after payment of creditors, for the purposes other than payment to New York University, as specified in paragraphs Third and Ninth (h) of this Certificate.
26. During the taxable years involved in this action, plaintiff’s activities have been conducted in accordance with the provisions of its Certificate of Incorporation.
27. At all times since its incorporation, the plaintiff’s total authorized issued and outstanding capital stock has consisted of 10 shares of the par value of $100 each. Such shares were subscribed for and paid on March 15,1948, as follows:
John Gerdes_$400 for 4 shares.
Dudley L. Miller_$300 for 3 shares.
Winthrop A. Short_$300 for 3 shares.
Thereafter, on March 31, 1948, after the transfer of the Knapp stock and the merger of the old Knapp corporations as hereinbefore described, John Grerdes transferred one of *819 his shares to Allan M. Pope. Winthrop A. Short at the same time transferred all of his three shares to said Allan M. Pope.
On the following day, April 1,1948, Allan M. Pope, John Gerdes and Dudley L. Miller, as the owners of all of the foregoing shares of stock of plaintiff, duly entered into a voting trust agreement, dated on said April 1, 1948. Under the terms of the agreement the voting trustees from April 1, 1948 to September 28, 1948, were Allan M. Pope, John Gerdes and Dudley L. Miller.
Pursuant to the terms of said voting trust agreement, and by instrument dated September 28,1948, Winthrop A. Short was added as a voting trustee. Since that date the voting trustees have been Allan M. Pope, John Gerdes, Dudley D. Miller and Winthrop A. Short.
All of the foregoing shares of plaintiff have at all times since then been held under the terms of said voting trust agreement. The purposes of the trust were twofold: to provide against a possible difficulty or inconvenience in the event of a stockholder’s death and to insure that at the termination of the voting trust agreement, the shares would be transferred directly to New York University.
None of the voting trustees or directors of the plaintiff has received any compensation during the years in question from the plaintiff for his services as such voting trustees or directors.
28. John Gerdes, Dudley Miller and Winthrop Short, who paid the original capital of $1,000, have never received a return of any portion thereof. They considered such payments of the original capital as contributions to New York University, but none of them has attempted to take an individual income tax deduction on the theory that the payment was a charitable contribution.
29. Allan M. Pope, a resident of Boston, Massachusetts, was vice chairman of the Council (the governing board) of New York University.
As stated in a preceding finding, John Gerdes, Dudley L. Miller, and Winthrop R,. Short are graduates of the New York University and are members of the law firm of Gerdes & Montgomery, general counsel for New York University. *820 Mr. Gerdes and other members of the firm have spent a substantial amount of time on the affairs of plaintiff since 1948. They have been compensated for such time by counsel fees.
SO. Since its organization, the control of plaintiff has at all times been vested in its board of directors. The business has been managed by the two Knapps, subject to the general supervision of. the board of directors. Most of the ideas affecting the operation of the business have been initiated by the Knapps or by other operating personnel. However, no action of importance has ever been taken with respect to the policies of plaintiff except with the approval of the board of directors. John Gerdes, Dudley Miller, and Allan Pope, representing the interests of New York University, have been in control of the board and have constituted a majority thereof.
31. In purchasing the stock of Knapp Brothers, Inc., and in entering into the 10-year employment contract with the Knapps, plaintiff did not intend to grant and did not grant any gratuity to the Knapps. In return for the purchase price and salaries paid by it, plaintiff received good and valuable consideration.
32. One of the reasons why the Knapps desired to sell the business to a group acting for New York University was the feeling on the part of the Knapps that an eleemosynary institution would not discharge the loyal employees who created the business. The Knapps believed that the interests of these loyal employees would be better served and that there would be less interference with the operation of the business in the future if it were acquired by New York University rather than by a private shoe manufacturing corporation.
33. By August 26, 1949, plaintiff had paid off the bank loan of $918,000, and by December 26, 1951, it had paid off all the Collateral Mortgage Notes issued to Elwin D. Knapp and Clarence E. Knapp in the aggregate amount of $4,182,-. 000. It had also paid interest on the notes in the aggregate amount of $343,627.-
*821 Prior to the payments above described, plaintiff listed the Collateral Mortgage Notes in its financial statements and in its income tax returns as obligations or liabilities.
34.The annual income of the plaintiff for the fiscal years ended March 31, 1949 to March 31, 1954, inclusive, was as follows:
Year Ending March SI— Net Taxable Income Federal Taxes Paid Net Income After-Taxes
1949_i_ $1, 799, 402. 55 $683, 772. 97 $1,115, 629. 58
1950_1_ 1,757,259.06 667,758.44 1,089,500.62
1951_ 2, 473, 288. 71 1, 284, 279. 15 1,189, 009. 56
1952_ 2, 673, 707. 18 1, 752, 895. 48 920, 811. 70
1953_ 3, 153, 919. 21 2, 146, 713. 17 1, 007, 206. 04
1954.. 2, 361,120. 14 1, 394, 232. 15 966, 887. 99
Totals.. 14, 218, 696. 85 7, 929, 651. 36 6, 289, 045. 49
35. Since its creation, and to April 29, 1955, the plaintiff has made the following contributions to affiliates of New York University, no part of which has inured to the benefit of any private shareholder or individual or has been used for the purpose of carrying on propaganda or otherwise attempting to influence legislation:
December 3, 1951 — $50,000 to New York University — Bellevue Medical Center.
December 3, 1951- — $50,000 to Law Center Foundation — New York University.
December 10, 1952 — $100,000 to New York University — Bellevue Medical Center.
November 16, 1953 — $100,000 to New York University — Bellevue Medical Center.
December 15, 1954 — $100,000 to New York University — Bellevue Medical Center.
36. During the years in suit, there was no distribution of earnings by plaintiff to New York University. Plaintiff was operating an expanding business with a large indebtedness. The directors of plaintiff deemed it to be in the best interests of New York University to pay off the purchase price and build up the business as a provider of substantial income in the future rather than to pay the university profits which the board of directors felt were needed in the development of the business.
Since plaintiff was organized, it has increased its inventory over $2,000,000 and has invested more than $1,000,000 in plants. In addition, it has, as stated above, paid off the entire purchase price of the business.
*822 37. For business reasons, plaintiff has made several small contributions during the years in suit to various local tax-exempt charities in the vicinity of its plants. The board of directors considered it a desirable policy to contribute to local charities in the cities where the employees reside. The amounts of such contributions for the years ending March 31, 1949, through March 31, 1951, were $2,247, $4,350, and $2,528, respectively.
With this exception, plaintiff has never paid out any moneys to any individual or organization other than New York University, except for a full and fair consideration received by it.
38. On or about June 15, 1949, the plaintiff filed with the Collector of Internal Revenue at Boston, Massachusetts, Form 1120, United States Corporation Income Tax Return, for the taxable period April 1, 1948, through March 31,
1949, This return contained a rider claiming exemption from tax and stating that the return was filed for information purposes only.
39. On or about June 15,1949, plaintiff filed with the Collector of Internal Revenue at Boston, Massachusetts, Form 1023, Affidavit Claiming Exemption from Federal Income Tax under Section 101 (6) of the Internal Revenue Code, together with Form 990, Annual Return of Organization Exempt from Income Tax under Section 101 of the Internal Revenue Code, for the fiscal period April 1, 1948, through March 81, 1949.
40. On February 20, 1950, the Commissioner of Internal Revenue informed plaintiff in writing that it was not entitled to exemption from Federal income tax under the provisions of 101 (6) of the Internal Revenue Code, for the reason that “the Bureau takes the position that a corporation which is engaged primarily in ordinary business operations is not exempt from Federal income tax notwithstanding all of its net income is destined for purposes specified in section 101 (6) of the Internal Revenue Code.” On August 24, 1950, the Commissioner of Internal Revenue by a letter to the plaintiff reaffirmed his ruling of February 20, 1950.
*823 41. The Form 1120 filed by the plaintiff for its taxable period April 1,1948, to March 31,1949, as set forth in finding 38 hereof, disclosed an income tax liability of $628,349.03. Of that amount, $157,087.26 was paid to the Collector of Internal Bevenue for the District of Massachusetts on each of the dates June 15, 1949, September 15, 1949, and December 15,1949, and the balance of $157,087.25 was paid to said collector on March 9, 1950.
42. On or about November 13,1951, the plaintiff, duly and timely and in the manner required by law, filed with the Collector of Internal Bevenue for the District of Massachusetts, on Treasury Department Form 843, a claim for the refund of income taxes paid by the plaintiff for the fiscal year ended March 31,1949, as set forth in finding 41 above, together with interest thereon.
43. On or about June 15,1950, the plaintiff filed with the Collector of Internal Bevenue at Boston, Massachusetts, Form 1120, United States Corporation Income Tax Beturn, for the taxable period April 1,1949, through March 31,1950. This return contained a rider claiming exemption from tax and stating that the return was filed for information purposes only.
44. On or about June 15, 1950, plaintiff filed with the Collector of Internal Bevenue at Boston, Massachusetts, Form 1023, Affidavit Claiming Exemption from Federal Income Tax under Section 101 (6) of the Internal Bevenue Code, together with Form 990, Annual Beturn of Organization Exempt from Income Tax under Section 101 of the Interna] Bevenue Code, for the taxable period April 1,1949, through March 31,1950.
45. The Form 1120 filed by the plaintiff for the period April 1, 1949, to March 31, 1950, as set forth in finding 43 hereof, showed an income tax liability of $618,899.75. Of that amount, $154,724.94 was paid to the Collector of Internal Bevenue for the District of Massachusetts on each of the dates June 15? 1950, September 14, 1950, and December 21,1950, and the balance of $154,724.93 was paid to said collector on March 14,1951.
*824 46. On or about November 18,1951, the plaintiff, duly and timely and in tbe manner required by law, filed with, the Collector of Internal Revenue for the District of Massachusetts on Treasury Department Form 843 a claim for the refund of income taxes paid by the plaintiff for the fiscal year ended March 81, 1950, as set forth in finding 44, together with interest thereon.
47. On or about June 27, 1951, the plaintiff filed with the Collector of Internal Revenue at Boston, Massachusetts, Form 1120, United States Corporation Income Tax Return, for the taxable period April 1,1950, through March 31,1951, together with Schedule EP, United States Computation of Corporation Excess Profits Tax, for said period. This return contained a rider claiming exemption from tax and stating that the return was filed for information purposes only.
48. On or about June 27,1951, the plaintiff filed with the Collector of Internal Revenue at Boston, Massachusetts, Form 1023, Affidavit Claiming Exemption from Federal Income Tax under Section 101 (6) of the Internal Revenue Code, and on or about July 10, 1951, plaintiff filed with said collector Form 990, Annual Return of Organization Exempt from Income Tax under Section 101 of the Internal Revenue Code, for the taxable period April 1,1950, through March 31,1951.
49. The income and excess profits tax return filed by the plaintiff for its fiscal year ended March 31,1951, as set forth ib finding 47, showed an income and excess tax liability of $1,187,807.55. Of that amount, $360,000 was paid to the Collector of Internal Revenue for the District of Massachusetts on June 13, 1951, $352,684.54 was paid to said collector on September 14, 1951, and $475,123.01, together with interest thereon in the amount of $6,560.61 was paid to said collector on March 4, 1952.
50. On or about November 13,1951, the plaintiff, duly and timely and in the manner required by law, filed with the Collector of Internal Revenue for the District of Massachusetts, on Treasury Department Form 843, a claim for the refund of income and excess profits taxes paid by the *825 plaintiff for the fiscal year ended March 31, 1951, in the amount of $712,684.54, together with interest thereon.
51. On or about June 13,1952, the plaintiff, duly and timely and in the manner required by law, filed with the Collector of Internal Revenue for the District of Massachusetts, on Treasury Department Form 843, an amended claim for refund of income and excess profits taxes paid by the plaintiff for the fiscal year ended March 31, 1951, in the amount of $1,187,807.55, with interest thereon.
52. On May 19, 1952, the Commissioner of Internal Revenue informed the plaintiff in writing that it was not entitled to exemption from Federal income tax under the provisions of Section 101 (6) of the Internal Revenue Code for any taxable year of its existence. ■
53. The income tax returns filed by the plaintiff for each of the fiscal years ended March 31, 1949 to March 31, 1951, inclusive, were audited by a representative of the Office of the Director of Internal Revenue, Boston, Massachusetts, in 1953. Between October 2, 1953 and October 30, 1953, inclusive, the Commissioner of Internal Revenue made jeopardy assessments against the plaintiff for alleged deficiencies in income tax for the fiscal years’ended March 31,1949, March 31, 1950 and March 31, 1951, in the respective amounts of $55,423.94, $48,858.69 and $96,202.01. Thereafter, on November 2, 1953, plaintiff paid the Director of Internal Revenue, Boston, Massachusetts, the amounts of said jeopardy assessments with interest thereon as follows:
Fiscal Year Ended— Amount of Payment
March 31,1949_$55,423.94 together with interest thereon of $14,631.41.
March 31, 1950_$48,858.69 together with interest thereon of $9,892.21.
March 31, 1951_$96,202.01 together with interest thereon of $13,705.49. -
54.On or about December 14,1953, the plaintiff, duly and timely and in the manner required by law, filed with the District Director of Internal Revenue, Boston, Massachusetts, on Treasury Department Form 843, amended claims for the refund of income taxes paid by the plaintiff for the fiscal years ended March 31, 1949 and March 31, 1950, in the respective amounts of $698,404.38 and $677,650.65, together *826 with interest thereon, and a second amended claim for the refund of income and excess profits taxes paid by the plaintiff for the fiscal year ended March 31, 1951, in the amount of $1,297,715.05, together with interest thereon.
55. The claims for refund filed by the plaintiff for the years involved herein, were all grounded on the claim that the plaintiff was exempt from income and excess profits taxes for these years under Sections 101 (6) of the Internal Revenue Code of 1939, Section 601 of the Revenue Act of 1951, and Section 454 of the Excess Profits Tax Act of 1950.
56. On January 6,1954, the District Director of Internal Revenue, Boston, Massachusetts, sent by registered mail to the plaintiff a formal rej ection of plaintiff’s claims for refund for the fiscal years ended March 31,1949, to March 31,1951, inclusive, on the basis of the revenue agent’s report dated December 28, 1953. The revenue agent’s report determined that the Collateral Mortgage Notes issued by the plaintiff were in effect preferred stock and that the interest paid by the plaintiff on said notes was equivalent to a distribution of dividends inuring to the benefit of private shareholders.
57. Since the filing of plaintiff’s above-described claims for refund, no action has been taken on these claims in Congress or in any of the Executive departments of the United States, or by the Commissioner of Internal Revenue, (except as herein stated), or in any judicial proceeding, other than the present one; and more than six months elapsed after the filing of each of said claims prior to any further action thereon by the plaintiff.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two million six hundred seventy-three thousand seven hundred seventy dollars and eight cents ($2,673,770.08),* together with interest thereon as provided by law.

As amended July 17, 1956.

As amended July 17, 1956.